# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MATTHEW LEFEBVRE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 15-13340-TSH** |
| NANCY BERRYHILL,[1] | ) | |
| Acting Commissioner, | ) | |
| Social Security Administration, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

### May 19, 2017

Hennessy, M.J.

The Plaintiff, Matthew Lefebvre, seeks reversal of the decision by the Defendant, the Commissioner of the Social Security Administration ("the Commissioner"), denying him Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), or, in the alternative, remand to the Administrative Law Judge ("ALJ").[2]  (Docket #19).  The Commissioner seeks an order affirming the decision.  (Docket #20).  By Order of Reference dated August 30, 2016, pursuant to 28 U.S.C. § 636(b)(1)(B) (Docket #23), this matter was referred to me for a report and recommendation on these motions.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy Berryhill is substituted for Carolyn W. Colvin, as the Acting Commissioner of the Social Security Administration as of January 23, 2017.

[2] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  However, separate, parallel statutes and regulations exist for DIB and SSI claims.  Therefore, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

For the reasons that follow, I hereby RECOMMEND that Lefebvre's Motion to Remand (Docket #19) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #20) be ALLOWED.

I.      BACKGROUND

A.      Procedural History

Lefebvre filed applications for DIB as well as SSI on July 18, 2012.  (Tr. 69, 70). Lefebvre alleges that he has been disabled since May 27, 2010.  (Tr. 202).  The applications were denied initially and upon reconsideration.  (Tr. 69-70, 93-94).  Lefebvre requested a hearing on February 20, 2013, (Tr. 110-11), and a hearing was held before an ALJ on January 28, 2014, (Tr. 24-48).  On April 9, 2014, the ALJ issued a decision finding that Lefebvre was not disabled.  (Tr. 8-23).

On July 14, 2015, the Appeals Council denied Lefebvre's request for review, making the ALJ's April 9, 2014 decision final and ripe for judicial review.  (Tr. 1-3).  Having timely pursued and exhausted his administrative remedies before the Commissioner, Lefebvre filed a complaint in this Court on September 10, 2015, pursuant to 42 U.S.C. § 405(g).  (Docket #1).  Lefebvre filed the motion for reversal or remand on June 16, 2016, (Docket #19), and the Commissioner filed a cross-motion on July 28, 2016, (Docket #20).  On August 11, 2016, Lefebvre filed a response to the Commissioner's motion.  (Docket #22).

B.      Personal History

At the time he claims he became disabled, Lefebvre was 27 years old.  (Tr. 94).  Lefebvre completed 11th grade and has a GED.  (Tr. 27).  Lefebvre is married and has a young child.  (Tr. 28, 31).  He does not have a driver's license and relies on his wife for transportation.  (Tr. 31). He previously worked as a bakery clerk and as an order picker-warehouse worker.  (Tr. 45).

C.     Medical History

On November 9, 2009, Lefebvre began treatment with Dr. Stephen Strasser.  (Tr. 310).
Lefebvre stated that his main concern was depression and anxiety, and that, while he had
experienced both for years, the past few weeks had been particularly difficult.  (Id.).  He
indicated that he had breakdowns where he cried, felt sad and down most days, and got anxious
easily over small things.  (Id.).  He also reported that his ambition had declined, he no longer got
pleasure from things that he used to get pleasure from, and he was short-tempered with his son.
(Id.).  Lefebvre stated that he had suicidal thoughts though they were not strong.  (Id.).  Dr.
Strasser diagnosed Lefebvre with depression and anxiety and provided informal counseling.
(Id.).  Lefebvre declined formal counseling, stating that he had it when he was a teenager and did
not find it helpful.  (Id.).  Dr. Strasser started Lefebvre on 20 mg of citalopram a day.  (Id.).

On January 5, 2010, at a follow-up appointment with Dr. Strasser, Lefebvre reported that
he was doing a lot better and that his mood was generally positive.  (Tr. 309).  He stated that he
had more interest in activities and, while he still had some anxiety attacks, they were mild, less
frequent, and he could easily manage them by calming himself down on his own.  (Id.).
Lefebvre also indicated that he had significantly reduced his alcohol intake and was sleeping
better.  (Id.).  He reported no suicidal thoughts.  (Id.).  Dr. Strasser diagnosed Lefebvre with
anxiety with panic attacks and dysthymia versus depression.  (Id.).

Lefebvre stated that he continued to feel well at a March 19, 2010 appointment with Dr.
Strasser.  (Tr. 308).  He reported that he was not really having anxiety or panic attacks, and,
while he would occasionally dwell on something for a day, this was rare and rarely went past a
day.  (Id.).  Dr. Strasser noted that Lefebvre continued to do well on his medication.  (Id.).

On June 28, 2010, Lefebvre reported to Dr. Strasser that he continued to feel well. (Tr. 307). While Lefebvre had lost his job in May 2010, he stated that he was managing and "does not feel stressed out." (Id.). He indicated that he provided most of the daycare for his son, which, for the most part, he enjoyed. (Id.). Dr. Strasser observed that Lefebvre was doing well with his medication. (Id.).

Lefebvre had a follow-up appointment with Dr. Strasser on September 28, 2010, at which he complained of not feeling as well. (Tr. 306). Lefebvre noted that he experienced down moods almost daily lasting minutes to hours, as well as anxious and panicky feelings. (Id.). He complained that he occasionally had palpations, but denied chest pain or shortness of breath. (Id.). Lefebvre reported having good support from his mother and his wife. (Id.). Lefebvre reported that, in general, he was productive at home, but stated that he had trouble motivating himself to leave the house at times. (Id.). He indicated that he could only go to stores for so long, and often had trouble in crowds. (Id.). Lefebvre again stated that he was not interested in formal counseling. (Id.). Dr. Strasser increased Lefebvre's prescription for citalopram to 40 mg daily. (Id.).

Lefebvre reported feeling somewhat better at a follow-up appointment with Dr. Strasser on November 10, 2010. (Tr. 304). He indicated that he still experienced occasional panic attacks but they were not as bad as before. (Id.). He stated that, although he felt no pressure, he would like to go back to work. (Id.). Lefebvre continued to decline to participate in formal counseling. (Id.).

On January 11, 2011, Lefebvre, accompanied by his wife, attended a follow-up visit with Dr. Strasser. (Tr. 302). Lefebvre's wife stated that he had plateaued in the prior two months and was not making progress as far as his mood. (Id.). Lefebvre reported getting anxious easily and

spending a lot of time at home. (Id.). He stated that he was uncomfortable leaving the home and is susceptible to being overwhelmed in crowds. (Id.). Lefebvre indicated that he was rarely in a down mood and, when he was in one, it did not last for long. (Id.). He also reported that he could get overwhelmed when his child, then three, was active. (Id.). Lefebvre stated that he had thought about going back to work, but was stressed about the job prospects with his former employer and had not looked for other work. (Id.). Dr. Strasser diagnosed Lefebvre with anxiety with some depression and agoraphobia, and increased his prescription of citalopram to 60 mg daily. (Id.). Dr. Strasser again encouraged Lefebvre to seek formal counseling. (Id.).

Lefebvre followed up with Dr. Strasser on March 16, 2011. (Tr. 300). Lefebvre reported doing about the same, stating that he had good days and bad days, with more good than bad. (Id.). Lefebvre stated that he was easily upset and was at times frustrated at caring for his three year-old son. (Id.). He reported suffering a breakdown that day due to complaints from his landlord about his rent being behind and the house not being kept up. (Id.). Lefebvre stated that he enjoyed spending time with friends, indicating that he had gone to crowded places with others, such as the mall. (Id.). He reported that he was thinking about going back to work at his former employer as there was a job there for him. (Id.). Dr. Strasser strongly advised Lefebvre to start behavioral therapy; however, Lefebvre stated that, while he would think about it, he was not ready to make a commitment. (Id.). Dr. Strasser observed that Lefebvre was socially and psychiatrically stable, but had not been ideally functional for quite some time. (Id.). Dr. Strasser decreased Lefebvre's prescription of citalopram to 40 mg daily and started him on 100 mg daily of sertraline. (Id.).

On May 16, 2012, Lefebvre saw nurse practitioner Diane Grasso, who noted that Lefebvre had not had medical care for over a year.[3] (Tr. 314). Lefebvre reported suffering from an anxiety and panic disorder. (Id.). Grasso referred Lefebvre for counseling. (Id.).

Lefebvre saw Erik Durmer, LMHC, for a mental health assessment on June 5, 2012. (Tr. 318-29). Lefebvre reported that he suffered from depression, anxiety, and panic attacks. (Tr. 318). He stated that he experienced negative thoughts, crying or the urge to cry, sleep and appetite disturbance, and feeling physically cold. (Id.). Lefebvre noted that he was a "gamer" and stated that he enjoyed meteorology, fishing, hiking, and making models, and that these activities brought him joy. (Tr. 319, 327). Lefebvre reported no limitations of activities of daily living; however, he indicated that he did not feel able to work due to his anxiety and depression. (Tr. 319-220). Durmer observed that Lefebvre was physically unkempt with normal eye contact, body movement, and speech. (Tr. 323). Lefebvre appeared anxious, restless, and depressed but was cooperative and showed normal thoughts although he had increased thought flow. (Id.). Durmer noted that Lefebvre was oriented with normal intellectual functioning, memory, insight, and judgment. (Id.). Durmer diagnosed Lefebvre with social phobia, separation anxiety, and depression and assessed a global assessment of functioning ("GAF") score of 50.[4] (Tr. 328).

On July 23, 2012, Lefebvre was evaluated by Dr. Thomas Weiss. (Tr. 359-60). Lefebvre complained that he had suffered depression, anxiety, and panic attacks since his early teens. (Tr. 359). Lefebvre explained that he was not currently taking medication, but had previously been on citalopram and Zoloft, stating he had not benefited from either of those medications in the

---

[3] During this period, Lefebvre moved from New York to Massachusetts. (See Tr. 359; compare Tr. 302 with Tr. 314).

[4] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000). A GAF score of 41 to 50 indicates serious symptoms or any serious impairment of social or occupational functioning. Id.

past. (Id.). He reported that he had been doing reasonably okay for the past year until a weeklong episode of isolation and anxiety two weeks earlier. (Id.). Lefebvre stated that he tried to push himself to go out in public very frequently. (Id.). Dr. Weiss noted that Lefebvre was oriented with normal memory and thoughts and showed no psychosis and had fair insight and judgment. (Tr. 360). Dr. Weiss diagnosed Lefebvre with recurrent depression, moderate, without psychotic features; panic and agoraphobia; rule out ADHD; alcohol abuse; and rule out bipolar disorder. (Id.). Dr. Weiss assessed a GAF score of 72 and started Lefebvre on Effexor.[5] (Id.).

On August 17, 2012, Lefebvre completed a function report. (Tr. 221-28). Lefebvre reported that he spent his time caring for his son and running errands as needed. (Tr. 221). He stated that he prepared meals daily, cleaned, and did laundry and minor repairs. (Tr. 223). Lefebvre noted that, prior to his illness, he was able to spend a lot of time in public areas and work, activities which he could no longer undertake. (Tr. 222). He stated that he could not go out alone and, when he did go out, he traveled by bike, rode in a car, or walked, but did not drive because his anxiety attacks made it difficult for him to focus. (Tr. 224). Lefebvre stated that he shopped for food and household needs two or three times a week for an hour to two at a time and was able to handle money. (Id.). He reported that his hobbies included reading, watching movies, building and painting models, playing video games, and fishing, and that he did these things once a day and did them well. (Tr. 225). Lefebvre stated that he chatted or went fishing with others once or twice a week and regularly went to lakes, stores, and counseling although he needed someone to accompany him. (Tr. 225). He reported trouble with memory and understanding, stating that he could pay attention for only a couple of minutes and did not finish

---

[5] A GAF score of 71 to 80 indicates that, if symptom are present, they are transient and expectable reactions to psychosocial stressors and there is no more than slight impairment in social or occupational functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

things he had started. (Tr. 226). He indicated that he could follow written instructions very well and spoken instructions fairly well and got along with authority figures very well. (Tr. 226-27). Lefebvre stated that he did not handle stress well and his response to changes in routine varied. (Tr. 227).

Lefebvre attended counseling with Durmer from December 2012 through December 2013. (Tr. 391-432). During this time period, Lefebvre failed to show or canceled several appointments. (Tr. 395, 397, 399, 406, 409, 411, 415, 417, 422, 426, 431). Several times Durmer stated that Lefebvre had poor insight into the triggers of his depression and anxiety and suggested that Lefebvre keep a journal to identify these triggers. (Tr. 408, 410, 430). Durmer noted on several occasions that Lefebvre did not complete this work. (Tr. 407, 427, 429). Lefebvre often indicated that he was dealing with familial and financial stress. (Tr. 403, 410, 412, 413, 420, 421, 428).

On July 23, 2013, Lefebvre presented at Heywood Hospital reporting that he had experienced suicidal thoughts without a specific plan for the past one-to-two weeks with worsening in the previous four days. (Tr. 366, 368). Lefebvre appeared uncomfortable and unkempt and was anxious, cooperative, quiet, and sad. (Tr. 366). Lefebvre was oriented and alert and had normal speech. (Tr. 366). A doctor noted that Lefebvre's symptoms in the emergency department were, at their worst, moderate. (Tr. 368). Lefebvre was offered a bed in a crisis stabilization unit but declined. (Tr. 369). Noting that he was in stable condition, Heywood Hospital discharged Lefebvre. (Id.).

On October 1, 2013, Dr. Weiss saw Lefebvre for medication management. (Tr. 401). Dr. Weiss diagnosed social phobia and observed that Lefebvre's mood was euthymic, he was much less depressed, had not had suicidal thoughts for one-and-a-half months, and his insight and

judgment were good.  (Id.).  Lefebvre saw Dr. Weiss again on November 27, 2013.  (Tr. 393).

Lefebvre reported no side effects with his current medications and stated that he was primarily

having anxiety with some bouts of depression.  (Tr. 394).

Durmer filled out a mental RFC questionnaire for Lefebvre on December 4, 2013.  (Tr.

380-84).  Durmer stated that he had seen Lefebvre biweekly since June 2012.[6]  (Tr. 380).  He

listed Lefebvre's diagnoses as social phobia with panic attacks and depression and assessed a

GAF score of 45.  (Id.).  Durmer identified Lefebvre's symptoms as:  thoughts of suicide;

persistent disturbances of mood or affect; deeply ingrained maladaptive patterns of behavior; and

recurrent severe panic attacks manifested by a sudden unpredictable onset of intense

apprehension, fear, terror, and sense of impending doom occurring on the average of at least

once a week.  (Tr. 381-82).  He noted that Lefebvre had not been assessed for work-related

limitations.  (Tr. 382-83).  Durmer stated that Lefebvre would be absent from work for more than

four days per month.  (Tr. 384).

On December 26, 2013, Dr. Weiss noted diagnoses of social phobia and a depressive

disorder and assessed a GAF score of 45.  (Tr. 389).  Lefebvre continued to have more frequent

anxiety attacks, waking up from anxiety attacks while dreaming, and mild bouts of depression.

(Tr. 390).  Dr. Weiss observed that Lefebvre had no side effects for many of his psychiatric

medications.  (Id.).

D.      State Agency Opinions

On September 13, 2012, Dr. Celeste Derecho, Ph.D., reviewed the record and found that

Lefebvre had severe impairments of anxiety, affective, and alcohol addiction disorders.  (Tr. 52).

Dr. Derecho opined that Lefebvre's affective and anxiety disorders caused moderate limitations

---

[6] It is unclear what Durmer means when using the term "biweekly."  I assume that Durmer means that he saw
Lefebvre once every two weeks as the record clearly shows that Durmer never saw Lefebvre more than once a week
during their treatment relationship.  (See Tr. 391-432).

in his activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 53). Dr. Derecho stated that Lefebvre could focus on a simple or detailed task over a two-hour timeframe, could work in proximity to others in a setting that was not crowded and that did not require frequent communication, could make simple decisions, and did not require special supervision. (Tr. 55). Dr. Derecho opined that, while the variability in Lefebvre's anxiety level and mood could reduce pace and attendance at times, he did not have psychiatric symptoms that would prevent adequate pace and attendance at a full-time job. (Id.). Dr. Derecho stated that Lefebvre would not be able to interact with the public, but could respond adequately to simple directions and instructions from a supervisor in the context of a routine job, and would not distract coworkers. (Id.).

On January 30, 2013, Peter Robbins, Ed.D, reviewed the record and opined that Lefebvre's anxiety, affective, and alcohol addiction disorders caused moderate limitation in his activities of daily living, mild limitations in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace and no episodes of decompensation of extended periods. (Tr. 75-76). Dr. Robbins stated that Lefebvre could sustain adequate pace, persistence, and concentration for simple tasks. (Tr. 78). Dr. Robbins concluded that, while Lefebvre was limited by his anxiety, it would not appear to prevent him from getting a job and that he had the ability to perform simple work outside his home. (Tr. 78-79).

E.      Hearing Testimony

A hearing before an ALJ was held on January 28, 2014, where Lefebvre, represented by an attorney, and a vocational expert gave testimony. (Tr. 24-48). Lefebvre testified that the last job he had was as a bakery clerk. (Tr. 27). He stated that he had been terminated from that

position due to insubordination, indicating that he had constantly argued with his boss.  (Tr. 27-28).  Lefebvre testified that he did not go back to work because he started having a hard time leaving his house.  (Tr. 28).  When he stopped work, Lefebvre became the primary caretaker for his young son.  (Id.).  He testified that he had problems on and off caring for his child, stating that sometimes even the smallest task could become overwhelming and he would have to force himself to complete it.  (Tr. 28-29).

Lefebvre stated that he did chores around the house including cooking, cleaning, and washing dishes.  (Tr. 36).  Lefebvre testified that he enjoyed meteorology, fishing, hiking, making models, and playing computer games.  (Tr. 29-30).  He stated that sometimes he had a hard time fishing and hiking as those activities required him to leave the house.  (Tr. 30).  Lefebvre testified that he could barely leave the house and only goes out once or twice a week for an hour.  (Tr. 31).  Lefebvre stated that he typically meets his son when he returns home from school at the bus stop, which is less than a block from his apartment, and that he and his wife trade off getting their son on the bus.  (Tr. 31-32).

Lefebvre stated that he had no side effects from his current medications but had suffered dizzy spells when on a previous medication.  (Tr. 34).  He reported that he suffered periods of depression, which lasted from a couple of hours to a couple of days, occurring at least once or twice a week where he did not want to even move.  (Id.).  Lefebvre stated that when these bouts of depression occurred, he would curl up in a blanket on the couch, had no appetite, and would not dress or shower.  (Tr. 35).  He reported having trouble with cleanliness in general.  (Tr. 39).  Lefebvre testified that when he was experiencing one of these bouts of depression, his wife would assume childcare duties.  (Tr. 36).  Lefebvre also testified to experiencing anxiety when leaving the house and being unable to be around a lot of people, no more than two.  (Tr. 37).  He

stated that he had panic attacks almost every time he went out, reporting that he got fidgety, lightheaded, and shaky, and that to end the panic attack he typically had to go home. (Tr. 37-38). He testified that seventy-five percent of his missed appointments with Durmer were due to his anxiety and not wanting to leave the house. (Tr. 44). Lefebvre also reported problems with his short-term memory and an inability to stay on task. (Tr. 40).

Following Lefebvre's testimony, the ALJ asked the vocational expert to consider an individual of Lefebvre's age, educational background, and past work experience who:

> retains the residual functional capacity for work with the following additional limitations. There would be no exertional limitations. The individual could do simple, routine, repetitive tasks which require concentration for up to two-hour time periods. There would be no interaction with the general public, minimal contact or interaction with coworkers. The individual would be limited to work in the lower one-third of the stress continuum, which I will define as no independent decision making required and no more than occasional changes in the work routine.

(Tr. 45-46). The ALJ asked the vocational expert whether such a hypothetical individual could perform the claimant's past work or any other work. (Tr. 46). The vocational expert responded that such an individual would be able to perform the position of warehouse worker. (Id.). The ALJ next asked the vocational expert to consider the same facts as those posed in the initial hypothetical with the additional limitation that the individual would miss work approximately four times a month. (Id.). The vocational expert testified that such an individual would not be employable. (Id.).

F.      Administrative Decision

In assessing Lefebvre's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits. See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

First, the ALJ considers the claimant's work activity and determines whether he is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is doing substantial gainful activity, the ALJ will find that he is not disabled. Id. The ALJ found that Lefebvre had not engaged in substantial gainful activity since May 27, 2010, the alleged onset date. (Tr. 13).

At the second step, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ determined that Lefebvre had the following severe impairments: anxiety, affective disorder, alcohol and substance abuse, and obstructive sleep apnea. (Tr. 13).

Third, the ALJ must determine whether the claimant has impairments that meet or are medically equivalent to the specific list of impairments listed in Appendix 1 of Subpart P of the Social Security Regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant has an impairment that meets or equals one of the impairments listed in Appendix 1, and meets the duration requirement, then the claimant is disabled. Id. The ALJ found that Lefebvre did not have an impairment or combination of impairments meeting, or medically equivalent to, an Appendix 1 impairment. (Tr. 18).

At the fourth step, the ALJ considers the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Whenever there is a determination that the claimant has a significant impairment, but not an "Appendix 1 impairment," the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(e). An individual's RFC is his ability to do physical and mental work activities on a sustained basis, despite limitations from his impairments. 20 C.F.R. § 404.1545(a)(1). The ALJ determined that:

> [Lefebvre] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: simple, routine, repetitive tasks which require concentration for up to two-hour time periods; no work requiring interaction with the general public; work requiring

only minimal contact or interaction with coworkers; no work requiring independent decision making; and no work requiring more than occasional changes in the work routine.

(Tr. 20). The ALJ determined that the Lefebvre was capable of performing past relevant work as an order-picker/warehouse-worker. (Tr. 22). Accordingly, the ALJ found that Lefebvre was not disabled at any time from May 27, 2010, through the date of decision. (Tr. 23).

## II.    STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard. Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991). The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence. Bath Iron Works Corp. v. United States Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003). Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act. Bowen v. Yuckert, 482 U.S. 137, 146 (1987). The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process. Id. at

146 n.5; <u>Vazquez v. Sec'y of Health & Human Servs.</u>, 683 F.2d 1, 2 (1st Cir. 1982).  This

includes the burden of establishing his RFC.  20 C.F.R. § 404.1512(c).

III.     ANALYSIS

A.     Weight of Opinions

    1.     Therapist Durmer

Lefebvre asserts that the ALJ discounted the opinion of Durmer, his treating therapist,

without providing adequate reasoning and, therefore, substantial evidence does not support the

ALJ's determination.  (Docket #19 at 4-5).

As an initial matter, the Social Security regulations preclude an ALJ from giving

controlling weight to opinions from those who are not "acceptable medical sources."  SSR 06-

03p ("Only 'acceptable medical sources' can be considered treating sources as defined in 20

CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").

Because Durmer, as a licensed mental health counselor, is not an "acceptable medical source"

under the regulations, his opinions are not entitled to controlling weight.  <u>See</u> 20 C.F.R.

404.1513(d)(1) (defining "other sources"); <u>see also</u>, <u>e.g.</u>, <u>Ortiz v. Colvin</u>, No. 14-30149-MGM,

2015 U.S. Dist. LEXIS 143119, at *19 (D. Mass. Oct. 20, 2015) ("[A] licensed mental health

counselor is not among the professions considered to be 'acceptable medical sources' under 20

C.F.R. §§ 404.1513(a) and 416.913(a), and thus is not considered a treating source entitled to

controlling weight.").    However, Durmer is an "other source," whose opinion must be

appropriately weighed.

An ALJ may not "ignore 'other medical sources' or fail to adequately explain the weight

given to such evidence."  <u>Taylor v. Astrue</u>, 899 F. Supp. 2d 83, 88 (D. Mass. 2012).  "Thus,

although 'other medical sources' are not entitled to controlling weight and an administrative law

judge is not required to provide 'good reasons' for the weight assigned to such opinions nor consult the factors listed in 20 C.F.R. §§ 416.927(C)(2)-(6) [or 404.1527(c)(2)-(6)], [the ALJ] still must adequately explain his treatment of the opinion so that a reviewer can determine if the decision is supported by substantial evidence." Id. at 88-89.

Here, the ALJ did not give weight to the findings of Durmer as expressed in the Mental Residual Functional Capacity Questionnaire he completed on December 4, 2013 because Durmer is not a physician and because Durmer did not specifically address whether and how Lefebvre may be limited from performing work-related tasks. (Tr. 22). The questionnaire completed by Durmer contains a section which requests the evaluator to give an opinion based on his examination of how his patient's mental or emotional capabilities are affected by the patient's impairments in order to determine how those impairments will affect the patient's ability to do work-related activities on a day-to-day basis in a regular work setting. (Tr. 382). Within this section of the form, the evaluator is specifically asked how the patient's impairments affect the patient's ability to "[m]aintain regular attendance and be punctual within customary, usually strict tolerances." (Id.). Durmer did not complete this section, stating that he had not assessed Lefebvre for work-related limitations. (Tr. 382-83). Later in the questionnaire, the evaluator is asked, on average, how often he anticipates his patient's impairments or treatment to cause the patient to be absent from work. (Tr. 384). Durmer opined that Lefebvre would be absent from work more than four days per month. (Id.). However, because Durmer failed to evaluate Lefebvre for work-related activities, including the ability to maintain regular attendance and be punctual, the basis for Durmer's opinion that Lefebvre would be absent from work for more than four days per month is unclear and was supportably rejected by the ALJ.[7]

---

[7] In his submissions, Lefebvre suggests that Durmer's opinion on absenteeism is based on Lefebvre's frequent absences from scheduled therapy appointments. (See, e.g., Docket #22 at 3). The record fails to support this, and

Thus, the undersigned finds that the ALJ reasonably accorded no weight to Durmer's opinion, and sufficiently explained the basis for that decision.

2.      Dr. Derecho

Lefebvre argues that the ALJ's decision is not supported by substantial evidence because the ALJ ignored the opinion of Dr. Derecho, a state agency reviewing psychologist.  (Docket #19 at 5).  The Commissioner's rulings expressly provide that state agency psychological consultants such as Dr. Derecho are experts in the Social Security disability programs.  SSR 96-6p.  While ALJs are not bound by the findings made by state agency psychologists, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  Id.; see also Hamlin v. Colvin, 199 F. Supp. 3d 247, 269 (D. Mass. 2016) ("ALJ may not simply ignore evidence contrary to his determinations.").  The Commissioner concedes that the ALJ did not specifically mention Dr. Derecho's opinion in his decision.  (Docket #21 at 11).  While this constitutes error, such error is harmless if Dr. Derecho's findings do not require any greater limitations than those assessed by the ALJ.  See Ward, 211 F.3d at 656 ("While an error of law by the ALJ may necessitate a remand, a remand is not essential if it will amount to no more than an empty exercise.") (internal citation omitted).

Both Dr. Derecho and the ALJ found that Lefebvre was moderately limited in his abilities to maintain social functioning and to maintain concentration, persistence, and pace.  (Compare Tr. 18-19 with Tr. 53).  Dr. Derecho opined that Lefebvre could focus on simple tasks over a

---

Durmer's prediction for Lefebvre's absences from work is without any identifiable basis.  While Lefebvre himself testified that seventy-five percent of his missed appointments were due to anxiety and fear of leaving his residence, (Tr. 44), the record also shows that Lefebvre had a history of noncompliance and lack of follow-through with his treatment.  Lefebvre consistently refused advice that he participate in formal counseling prior to May 2012.  (See Tr. 300, 302, 304, 306, 310).  Additionally, although prescribed psychiatric medication by Dr. Strasser, Lefebvre did not take the medication for over a year and was not on any other medication for his mental impairments during the time period between his move from New York and when he began seeing Dr. Weiss.  (Tr. 359).

two-hour timeframe, (Tr. 55), as did the ALJ, (Tr. 20).[8]  The ALJ's finding that Lefebvre could not interact with the general public but could do work requiring minimal contact or interaction with co-workers, (Tr. 20), is consistent with Dr. Derecho's opinion that Lefebvre could not interact with the public but could work in proximity to others in a setting that was not crowded and that did not require frequent communication and that he would not distract coworkers, (Tr. 55).[9]  The ALJ's finding that Lefebvre could do work that did not require independent decision making and required no more than occasional changes, (Tr. 20), was more restrictive than Dr. Derecho's opinion that Lefebvre could make simple decisions and had no adaptation limitations, (Tr. 55).

There is one instance in which the ALJ found that Lefebvre was less limited than Dr. Derecho.  Dr. Derecho opined that Lefebvre's impairments caused moderate limitations in activities of daily living, (Tr. 53), while the ALJ found that Lefebvre's impairments caused only mild limitations in activities of daily living, (Tr. 18).  Like Dr. Derecho, Dr. Robbins also found that Lefebvre's impairments caused moderate limitations in activities of daily living. (Tr. 76).  The ALJ supportably discounted this facet of Dr. Robbins' opinion due to later evidence that Lefebvre was able to take his son to and from the bus stop and to take care of errands.  (Tr. 18).  The ALJ's reasoning is equally applicable to Dr. Derecho's opinion with respect to activities of

---

[8] Dr. Derecho further opined that Lefebvre could focus on a detailed task over a two-hour timeframe, a finding less restrictive than that of the ALJ.  (Compare Tr. 20 with Tr. 55).

[9] Lefebvre argues that the ALJ's inclusion of the limitation that Lefebvre can perform "work requiring only minimal contact or interaction with coworkers" does not address Dr. Derecho's assessment that Lefebvre can only "work in proximity to others in a setting that is not crowded."  (Docket #22 at 5).  While I believe that these two findings are consistent, I note any error in this context would be harmless as the vocational expert specifically testified that the position of warehouse worker, work that the ALJ determined Lefebvre remained capable of performing, was that of someone working individually at a warehouse.  (See Tr. 46-47).  Moreover, while Dr. Derecho's meaning of "crowded" is not explained, Lefebvre unilaterally imposes his own definition, stating that "a lot of people" means more than two.  (Tr. 37).

daily living. I note that Lefebvre does not challenge the weight that the ALJ assigned to Dr. Robbins' opinion on this same issue.

Therefore, because Dr. Derecho's findings do not necessitate any greater limitations than those assessed by the ALJ, except where supportably discounted, the ALJ's failure to weigh Dr. Derecho's opinion is harmless and remand is not required.

B.    Vocational Expert Testimony

Lefebvre argues that the ALJ's finding at step four that Lefebvre retained the RFC to perform past relevant work as an order picker/warehouse worker, is inadequately supported by the evidence. (Docket #19 at 8).

"The opinion of a vocational expert that a Social Security claimant can perform certain jobs qualifies as substantial evidence[.]" Sousa v. Astrue, 783 F. Supp. 2d 226, 235 (D. Mass. 2011). "In order to be substantial evidence, however, the opinion of the vocational expert must be in response to a hypothetical that accurately describes the claimant's limitations." Id.; see Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982) ("in order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities. To guarantee that correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions."). Here, the ALJ presented to the vocational expert a hypothetical individual of Lefebvre's age, education, and work experience with a RFC for work with no exertional limitation, with the ability to do simple, routine, repetitive tasks requiring concentration for up to two-hour time periods, and requiring no interaction with the general public, minimal contact or interaction with coworkers, no

independent decision making, and no more than occasional changes in the work routine. (Tr. 45-46). Based on this hypothetical, the vocational expert testified that such an individual could perform the position of warehouse worker. (Tr. 46).

Lefebvre contends that the ALJ failed to accurately describe all of Lefebvre's mental limitations in the hypothetical posed to the vocational expert. (Docket #19 at 9). In his opinion, the ALJ found that Lefebvre had moderate difficulties with respect to concentration, persistence, and pace. (Tr. 19). Lefebvre argues that the ALJ failed to include any restrictions accounting for these limitations in his hypothetical. (Docket #22 at 7-8).

In finding that Lefebvre was moderately limited with respect to concentration, persistence, and pace, the ALJ gave weight to the findings of Dr. Robbins. (Tr. 19). While opining that Lefebvre's anxiety, affective, and alcohol addiction disorders caused moderate limitations in maintaining concentration, persistence, or pace, Dr. Robbins determined that Lefebvre could sustain adequate pace, persistence, and concentration for simple tasks. (Tr. 75-76, 78). Dr. Robbins concluded that, while Lefebvre was limited by his anxiety, it would not appear to prevent him from getting a job and that he had the ability to perform simple work outside his home. (Tr. 78-79). While the ALJ did not expressly rely on Dr. Derecho's opinion, Dr. Derecho also opined that Lefebvre's affective and anxiety disorders caused moderate limitations in maintaining concentration, persistence, or pace. (Tr. 53). Dr. Derecho stated that Lefebvre could focus on a simple or detailed task over a two-hour timeframe, could work in proximity to others in a setting that was not crowded and that did not require frequent communication, could make simple decisions, and did not require special supervision. (Tr. 55). Dr. Derecho opined that, while the variability in Lefebvre's anxiety level and mood could reduce pace and attendance at times, he did not have psychiatric symptoms that would prevent adequate

pace and attendance at a full-time job. (Id.). Dr. Derecho stated that Lefebvre would not be able to interact with the public but could respond adequately to simple directions and instructions from a supervisor in the context of a routine job and would not distract coworkers. (Id.).

"A finding of moderate limitations in maintaining concentration, persistence, or pace, does not necessarily preclude the performance of unskilled work." Perry v. Astrue, No. 11-40215-TSH, 2014 U.S. Dist. LEXIS 139575, at * 15 (D. Mass. Sept. 30, 2014). "When an acceptable medical source provides an opinion that despite moderate limitations in concentration, persistence, or pace the claimant is able to do unskilled work or simple routine work, no further restriction in residual functional capacity is necessary." Mudgett v. Colvin, No. 14-cv-143-JD, 2014 U.S. Dist. LEXIS 170099, at *8 (D.N.H. Dec. 9, 2014), (citing Falcon-Cartagena v. Comm'r of Soc. Sec., 21 F. App'x 11, 14 (1st Cir. 2001) (concluding that a moderate limitation in nonexertional functioning required for unskilled work does "not affect, more than marginally, the relevant occupational base")). While Dr. Robbins found that Lefebvre's ability to maintain concentration, persistence, and pace was moderately limited, he concluded that these limitations did not preclude Lefebvre from getting a job and that he had the ability to perform simple work outside his home. (Tr. 78-79). Similarly, Dr. Derecho concluded that, despite moderate limitations in his ability to maintain concentration, persistence, and pace, Lefebvre did not have psychiatric symptoms that would prevent adequate pace and attendance at a full-time job. (Tr. 55). The ALJ adequately accounted for the effects of Lefebvre's limitations with respect to concentration, persistence, and pace as opined by Dr. Robbins and Dr. Derecho in the hypothetical he posed to the vocational expert, limiting Lefebvre to only simple, routine, repetitive tasks requiring concentration for up to two-hour time periods. The ALJ also appropriately accounted for the effects of Lefebvre's limitations with respect to social

functioning, limiting Lefebvre to only minimal contact or interaction with coworkers and no interaction with the general public.  Hence, remand is not required.

IV.     CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Lefebvre's Motion to Remand (Docket #19) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (Docket #20) be ALLOWED. [10]

/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE

---

[10] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).